1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9         CENTRAL DISTRICT OF CALIFORNIA

10

11  MANUEL JOE PADILLA,        )     Case No. CV 09-5651VAP(Ex)
                               )
12              Plaintiff,     )     **FINDINGS OF FACT AND**
                               )     **CONCLUSIONS OF LAW**
13       v.                    )
                               )
14  UNITED STATES OF           )
    AMERICA,                   )
15                             )
                Defendant .    )
16  _____)

17      This case was tried to the Court without a jury on

18  August 28, 29, and 30, 2013, and the Court took the

19  matter under submission at the conclusion of trial.  The

20  Court, having considered all the evidence presented by

21  the parties, the written submissions from both sides, and

22  the argument of counsel, issues the following Findings of

23  Fact and Conclusions of Law.

24

25

26

27

28

**FINDINGS OF FACT**

1.  Tony Richard Padilla ("Padilla") was the son of
    Plaintiffs Manuel Joe Padilla and Clara Fernandez.[1]
    Padilla had been incarcerated at the United States
    Penitentiary in Victorville, California ("USP
    Victorville") since April 11, 2006, and as of May 27,
    2006, he was housed in the penitentiary's Special
    Housing Unit ("SHU").  He had been transferred to the
    SHU to be placed in protective custody after he had
    been attacked by other inmates affiliated with a
    different prison gang.  Ex. 24J.

2.  Mario Peña Llanas ("Peña Llanas") had been
    incarcerated at USP Victorville since January 27,
    2006, after his conviction for violation of 8 U.S.C.
    § 1326, illegal reentry into the United States after
    deportation.  He was transferred to the SHU on May
    27, 2006, because he had been fighting with other
    inmates while housed in general population.  Ex. 23F.

3.  Upon his transfer to the SHU on May 27, 2006, Peña
    Llanas was assigned to share Cell 206 with Padilla.
    On July 9, 2006, Padilla and Peña Llanas were moved
    to Cell 215.

4.  USP Victorville is one facility in the Victorville
    Federal Correctional Complex, and is located within
    the Central District of California.

---

[1]Clara Fernandez died during the pendency of the case
and has been dismissed.

**Conditions and Procedures at USP Victorville's**

**Special Housing Unit**

5.  Inmates housed in the SHU at USP Victorville are
    confined to their cells for 23 hours each day, taking
    their meals and showers inside the cell.  They are
    released for one hour per day to exercise in a
    confined exercise area.  The dimensions of both cells
    shared by Padilla and Peña Llanas, Cells 206 and 215,
    were eight feet by twelve feet.

6.  SHU staff conducts checks on the inmates every 30
    minutes during daytime and evening hours.  During
    these checks, the correctional officers look into
    every cell through the window in the cell door.
    Inmate safety is the primary purpose of these checks.

7.  Five times per day, SHU staff does an inmate count.
    These are conducted at midnight, 3:00 a.m., 5:00
    a.m., 4:00 p.m., and 10:00 p.m. on weekdays; the
    primary purpose of the inmate count is ensuring that
    all inmates are present and accounted for.

8.  Approximately three times per week, the lieutenant in
    charge of the SHU conducts rounds, during which he or
    she addresses such issues as medical and dental care
    needs, counseling, and law library access with the
    inmates.  The lieutenant looks into each cell during
    these rounds, and spends between 15 seconds and 15

1    minutes talking to each inmate.  The warden conducts

2    rounds of the SHU once per week, accompanied by other

3    Bureau of Prisons ("BOP") staff.

4

5    **Policies in Force at the USP Victorville SHU Regarding**

6    **Violence Between Inmates**

7  9.  The evidence presented at trial revealed (1) a policy

8     existed requiring BOP staff to investigate reports or

9     witnessed incidents of fighting between cellmates;

10     and (2) no policy, written or otherwise, existed

11     mandating reassignment of cellmates following a

12     physical altercation.

13     a.  All of the BOP staff members who testified were

14        careful to state (in nearly identical language)

15        that there were no mandatory written BOP

16        policies regarding the reassignment of cellmates

17        who engaged in physical fighting.

18     b.  Jermaine Diaz worked as a correctional officer

19        in the USP Victorville SHU from May 2006 through

20        August 2006.  He investigated any reports made

21        to him of inmate fights, and would notify the

22        Officer in Charge and the lieutenant in his

23        chain of command of any such reports or

24        incidents.  He could not recall any situation

25        where two cellmates were found fighting and were

26        not separated, *i.e.*, not reassigned to share a

27        cell with a different inmate.

28

4

c.  Tony Quale, employed by BOP at the Victorville
    Federal Correctional Complex since 2000, first
    assigned to the SHU in 2005, and now holding the
    title of "Safety and Compliance Specialist" at
    USP Victorville, testified no mandatory policy
    exists mandating separation of inmates following
    a report of violence between them.  He would
    report any inmate fights he observed to the SHU
    lieutenant, and would investigate any reports of
    violence.  Pedro Barajas, a correctional officer
    working in the SHU in August 2006, testified he
    too investigated when he observed or got reports
    of inmate fights, and would pass along the
    information to his superior officer.
    Correctional Officer Joseph Martinez testified
    to the same effect:  he would investigate and
    report to his superior officer any reports or
    observations of inmate fights.  Both Quale and
    Barajas testified that no BOP policy exists
    regarding procedures that staff must follow when
    an inmate reports a fight.

d.  Jesus Sanchez, another corrections officer
    working at the SHU in USP Victorville in August
    2006, testified that when he saw inmates
    fighting, he would separate the inmates in order
    to investigate.  He could not recall any

1       instances where inmates who fought in the SHU
2       were not reassigned to different cells.
3   e.  Eduardo Madrid, another correctional officer
4       working at the USP Victorville SHU in August
5       2006, testified that fighting between inmates
6       was "not tolerated" by the staff, *i.e.*, both
7       inmates would be disciplined if found fighting.
8   f.  Scott Williams served as the lieutenant in
9       charge of the SHU at USP Victorville in August
10      2006.  He testified that the SHU was filled to
11      capacity at that time; if an inmate requested a
12      move, he would have to swap cells with another
13      inmate.  He too testified that inmate fighting
14      "was not tolerated."
15  g.  Like the other BOP employees who testified,
16      Williams emphasized the lack of a written
17      institutional policy mandating separation of
18      cellmates who had fought.
19  h.  According to Williams's trial testimony, if an
20      inmate submitted a written complaint, the
21      complaint would be sent to Williams, who would
22      read it, and if it referred to a fight or
23      assault, he first would investigate by talking
24      to both inmates.  If the inmates were housed
25      together, Williams would reassign them to
26      different cells only if he thought the fighting
27      would continue.  Williams also testified that a
28

1        written complaint about inmate fighting would
2        not be retained in an inmate's file or BOP files
3        unless, after investigation, the complaint was
4        found to be "legitimate."

5    i.  Captain Robert Hodak, who was a Special
6        Investigation Services ("SIS") agent at USP
7        Victorville in August, 2006, testified that
8        although it was "always a problem" to reassign
9        inmates, it was done whenever necessary.
10       Although at trial, Hodak testified that the only
11       factors BOP staff consider in making cell
12       assignments for SHU inmates were "race,
13       religion, gang affiliation, basis for transfer
14       to the SHU, and geography," during his
15       deposition, Hodak stated he would reassign two
16       cellmates who requested it "to avoid problems."

17   j.  Hodak also testified that all complaints were
18       passed on to him because the staff had the
19       obligation to do so, and it was his practice to
20       investigate any complaint of fighting and err on
21       the side of caution by separating the cellmates.
22       Finally, Hodak testified during his deposition
23       that if inmates celled together posed a threat
24       to one another, the "general understanding" or
25       unwritten policy was to separate them.

26   k.  The BOP officials testified that serious
27       incidents of violence between inmates must be

7

reported to the lieutenant in charge of the SHU. Williams and Hodak testified that they would receive reports of any violent conflicts between inmates; Hodak testified that he knew would be notified of such because corrections officers were required to make such reports.

l.    Upon receiving such a report of violence or threatened future violence, the BOP staff would conduct an investigation and attempt informally to determine if the cellmates were seeking separate quarters or if there was a danger of future violence.

10.   In sum, the evidence was insufficient to demonstrate the existence of a mandatory, nondiscretionary policy of separating cellmates housed in the SHU.  The testimony taken as a whole revealed a policy and practice of investigating reported or observed inmate fighting or violence, but the outcome of such investigations, i.e., whether the cellmates would be reassigned, depended heavily on a number of factors. Even the evidence most favorable to Plaintiff on this issue, the testimony by correctional officers Diaz and Sanchez that they could not recall any instances when cellmates who fought were not reassigned, and by Hodak that his usual practice or protocol would be to reassign cellmates after a fight in order to avoid future problems, does not amount to evidence of a

1    nondiscretionary policy mandating such reassignments

2    in all circumstances where fighting occurred.

3

4            **Altercations Between Padilla and Peña Llanas**

5    11.  Peña Llanas's BOP records showed he was disciplined

6         numerous times for fighting before 2006.  <u>See</u> Exs.

7         10-B, 10-C, 10-D, 10-F, 10-G.  Peña Llanas admitted

8         during his trial testimony that by May 27, 2006, when

9         he was transferred to the USP Victorville SHU, he had

10        been in fights with other inmates about 20 times.

11   12.  Nevertheless, SHU staff considered Peña Llanas one of

12        the "less dangerous" inmates on the unit, and in

13        approximately July 2006, Williams assigned him an

14        orderly position on his tier.  Williams testified he

15        would not have given Peña Llanas this assignment if

16        he had known that Peña Llanas had ever assaulted his

17        cellmate in the SHU.  Serving as an orderly was a

18        privilege for SHU inmates, because rather than being

19        confined to one's cell for 23 hours per day, an

20        orderly was allowed outside while performing his

21        duties and often had access to extra food.

22   13.  Peña Llanas testified he began fighting with Padilla

23        within 15 minutes of meeting him in the cell they

24        were assigned to share on May 27, 2006.  The fight

25        began when Peña Llanas observed Padilla exposing his

26        genitals to an inmate housed across the hall.

27        Although Padilla stopped this behavior when Peña

28

Llanas protested, he soon resumed.  Peña Llanas began
to fight with Padilla, and hit or punched him
repeatedly.  Peña Llanas called out to a correctional
officer he heard in the corridor, and told the
officer he and Padilla were fighting because Padilla
repeatedly exposed his genitals.  Peña Llanas also
told this correctional officer that things between
the two cellmates "were getting out of hand," and
showed his injured hand.  The correctional officer
responded by telling Peña Llanas to "do what he had
to do" and that there should be "no blood."  Peña
Llanas told the correctional officer he was worried
about his safety because Padilla was much larger and
heavier, and that he wanted to be moved to a
different cell.  The correctional officer told him
there were no cells available.

14. Later the same day, after a shift change, Peña Llanas
told another officer he was worried about his safety,
showed the officer his injured hand, and asked to be
transferred.  This officer also told Peña Llanas
there were no available cells to which he could be
transferred.

15. Several BOP employees, including Quale, Martinez,
Diaz, Williams, Sanchez, and Hodak, testified that
Peña Llanas and Padilla appeared to get along well as
cellmates; at least one of these witnesses described
the two as a "happy little couple."  Hodak, for

10

example, testified he was not aware of any problems
or discord between the two cellmates before August 8,
2006.  Other officers testified that they never
witnessed or heard of any discord between Peña Llanas
and Padilla.

16.  Peña Llanas testified that after his initial requests
for transfer were denied, he told Padilla he did not
want to continue fighting and began to try to get to
know and help his cellmate.  Padilla showed Peña
Llanas pictures of his family, and Peña Llanas helped
Padilla by writing letters for him.  This confirms
the testimony from the BOP staff that there appeared
to be no friction between these cellmates.

17.  Nevertheless, Padilla's chronic, open masturbation in
the shared cell was a constant cause for arguments
and fights between the two cellmates, and Peña Llanas
testified that he continued to complain about it to
correctional officers.  He complained both orally and
by sending "cop outs," or written complaints,
requesting to speak to the lieutenant in charge of
the SHU about a transfer.  The absence of any record
of these written complaints does not undercut Peña
Llanas's credibility on this issue; as noted above,
the BOP employee witnesses testified that such
records were not retained unless an investigation had
been done and any complaint had been "sustained."

18. Peña Llanas testified that he and Padilla physically fought about ten times before August 7, 2006, and some of these fights were witnessed by correctional officers, including Officers Madrid and Diaz.  Peña Llanas brought these fights to the attention of other correctional officers.

19. Peña Llanas also testified that although he repeatedly complained to corrections officers about Padilla's chronic masturbation, his fear of Padilla, and his fear of future violence between him and his cellmate, his complaints and warnings were never investigated.

20. The Court found credible Peña Llanas's testimony regarding (1) the pattern of violent conflict between Padilla and Peña Llanas, (2) his verbal and written complaints to BOP staff, and (3) the failure of the BOP staff to investigate or act in any manner on the complaints and warnings.

   a. Peña Llanas's testimony that he assaulted Padilla approximately ten times before August 7, 2006, constituted admissions against his penal interest.  Even if the statute of limitations, or the plea agreement[2] between Peña Llanas and the government, barred his future prosecution for this conduct, it still constitutes admission of

_____

[2]Peña Llanas pled guilty to voluntary manslaughter and assault with a deadly weapon on February 13, 2009, pursuant to a plea agreement.

12

criminal conduct. Furthermore, Peña Llanas stood to gain nothing by testifying for Plaintiff; rather, as he faces a long period of incarceration in BOP custody, testifying against the interests of the Government, and the BOP officials in whose custody he is confined, is also against his interest.

b.   Key points of Peña Llanas's testimony were corroborated by other witnesses. For example, corrections officer Barajas testified that when he arrived at Cell 215 on August 8, 2006, he observed that Padilla's face was swollen and puffy. The fatal blows that night, however, were two kicks to Padilla's temple. The swelling and puffiness on his face that officer Barajas observed was consistent, however, with a beating the night before, as Peña Llanas testified he had inflicted on his cellmate because of the latter's open masturbation.

c.   Inmate Luiz Edsall testified he had witnessed injuries on Padilla on more than one occasion.

21.  Williams and Hodak testified they were unaware of any violence between Padilla and Peña Llanas. They each testified they never received or heard any reports of past confrontations, written or oral, nor any warnings of future violence.

22. Their subordinates testified they knew it was their
    responsibility to forward any complaints by inmates
    to the lieutenant in charge, or to investigate these
    complaints themselves.  Nevertheless, they all denied
    having received any complaint or warning from Peña
    Llanas, and denied any awareness of the assaults
    inflicted on Padilla by Peña Llanas.

23. Hence, having accepted the testimony of Peña Llanas
    that he made complaints and warned of future violent
    conflicts with his cellmate, the Court finds that
    either (1) those officials with supervisory
    responsibility in the SHU received the complaints and
    failed to act on them, or (2) those corrections
    officers to whom the complaints were made orally, or
    to whom the written complaints were handed, failed to
    forward them to their superiors.


                    **The Fatal Assault on Padilla**

24. Both Padilla and Peña Llanas were in their cell on
    August 7, 2006, when Padilla began masturbating; Peña
    Llanas warned him to stop and when Padilla did not,
    Peña Llanas punched him in the face, bruising
    Padilla's eye.

25. Peña Llanas's account that he had inflicted visible
    injuries on Padilla on August 7, 2006, was supported
    by testimony from inmate Edsall.  Edsall worked as
    the barber for the SHU inmates, and claimed he saw

                                14

1    Padilla with a black eye and bruises and notified
2    Williams about it, who told him there was no other
3    available cell for Peña Llanas.
4  26.  The next day, August 8, 2006, Peña Llanas reported
5    for work on his orderly shift.  At the end of his
6    shift at approximately 8:00 p.m., Madrid and Sanchez
7    escorted Peña Llanas back to his cell.  Then,
8    according to Peña Llanas, Sanchez observed the
9    obvious injury to Padilla's face from the blows Peña
10   Llanas had inflicted the previous day.  Sanchez asked
11   Padilla if he had suffered an injury in the
12   recreation room, and Padilla gestured toward Peña
13   Llanas.  Nevertheless, the officers placed Peña
14   Llanas back in his cell with Padilla and uncuffed
15   him.
16 27.  Shortly after this, Peña Llanas observed Padilla once
17   again masturbating, this time while looking at a
18   letter written to Peña Llanas by his sister.  This
19   angered Peña Llanas so much that he grabbed the
20   letter away from Padilla and kicked him twice,
21   hitting Padilla in the temple with his foot.
22 28.  Peña Llanas did not intend to kill Padilla when he
23   kicked him, but was angry with his cellmate and
24   wanted to make Padilla stop masturbating.  He was
25   afraid of Padilla, because of the latter's size
26   advantage, and testified he previously had told
27   correctional officers he was afraid he might "do

15

something stupid" if he was not transferred to
another cell, as a result of Padilla's inappropriate
behavior.  And, Peña Llanas explained, when two
inmates began fighting, "who knew what would happen?"

29. Immediately after Peña Llanas kicked Padilla in the
temple, Padilla fell to the floor, and began
groaning, twitching, bleeding and foaming from his
mouth.  Peña Llanas tried to assist Padilla, brought
him water and tried to comfort him, urging Padilla to
think of his mother.

30. Barajas was working in the USP Victorville SHU the
night of August 8, 2006.  At approximately 10:15 p.m.
he was called to Cell 215.  Peña Llanas told Barajas
that Padilla was suffering a seizure.  Barajas
observed that Padilla's face was "puffy" and one eye
was swollen up and closed.

31. Dr. Frank Sheridan, the forensic pathologist who
performed the autopsy on Padilla, testified that
Padilla died on August 12, 2006, at the Arrowhead
Regional Medical Center as a result of the injuries
sustained in the assault.

32. Peña Llanas pled guilty to one charge of voluntary
manslaughter of Padilla, and one count of assault
with a deadly weapon on him, on February 13, 2009.

16

**CONCLUSIONS OF LAW**

1. The Court has jurisdiction over this negligence action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

**Elements of a Negligence Claim**

2. The incident giving rise to this action, _i.e._, the killing of Tony Padilla, occurred within the jurisdiction of the Central District of California, and the Court applies the California substantive law of negligence.  28 U.S.C. §§ 1346(b), 2674.

3. To prove negligence, a plaintiff must show "that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff."  Ann M. v. Pac. Plaza Shopping Ctr., 6 Cal. 4th 666, 673 (1993) (citing United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal. 3d 586, 594 (1970)), and 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 732, p. 60), disapproved on other grounds by Reid v. Google, Inc., 50 Cal. 4th 512, 516 (2010).

4. California applies the substantial factor test of the Restatement Second of Torts to determine causation. "Under that standard, a cause in fact is something that is a substantial factor in bringing about the

1    injury." <u>Rutherford v. Owens-Illinois, Inc.</u>, 16 Cal.

2    4th 953, 968-69 (1997) (citations omitted).

3

4        **The Discretionary Immunity Exception to the FTCA**

5    5.   The FTCA embodies a limited waiver of sovereign

6         immunity for specified tort actions arising out of

7         the conduct of federal employees.  28 U.S.C. § 2674.

8    6.   If the claim under the FTCA stems from a federal

9         employee's exercise of a "discretionary function,"

10        however, then liability is barred under 28 U.S.C.

11        § 2860 (a), which provides:

12            [a]ny claim based upon an act or omission of an

13            employee of the Government, exercising due care,

14            in the execution of a statute or regulation,

15            whether or not such statute or regulation be

16            valid, or based upon the exercise or performance

17            or the failure to exercise or perform a

18            discretionary function or duty on the part of a

19            federal agency or an employee of the Government,

20            whether or not the discretion involved be abused.

21   7.   The courts have developed a two-part test to

22        determine whether the discretionary function

23        exception bars a particular claim.  "First we must

24        decide whether the challenged conduct is

25        discretionary, that is, whether it 'involv[es] an

26        element of judgment or choice. . . .  'This element

27        is not met "when a federal statute, regulation or

28

18

policy specifically prescribes a course of action for
an employee to follow."' . . . If the act is not
discretionary, the government is not immune."  <u>Alfrey</u>
<u>v. United States</u>, 276 F.3d 557, 561 (9th Cir. 2002)
(citing <u>Fang v. United States</u>, 140 F.3d 1238, 1241
(9th Cir. 1998) and <u>Berkovitz v. United States</u>, 486
U.S. 531, 536 (1988)).

8.   If the challenged conduct is discretionary, then in
the second step the Court determines "'whether that
judgment is of the kind that the discretionary
function exception was designed to shield.'"  <u>Id.</u>

9.   The conduct challenged here is the failure by the BOP
staff to separate Padilla and Peña Llanas, and assign
them to different cells.  The Government bears the
burden of showing discretionary function immunity
applies.  <u>Terbush v. United States</u>, 516 F.3d 1125,
1128 (9th Cir. 2008) (citing <u>Prescott v. United</u>
<u>States</u>, 973 F.2d 696, 702 (9th Cir. 1992)).  Hence,
the Court first examines whether the Government has
met its burden of showing the absence of any
mandatory policy, regulation, or statute regarding
the separation of inmates who repeatedly fought in
the cell when confined in the SHU.

10.  Plaintiff concedes there was no mandatory statute or
regulation governing the separation or assignment of
inmates in the SHU.  He contends, instead, that the
BOP "policy" or "protocol" is to separate inmates if

the prison staff receive a complaint or request to
move an inmate to prevent future harm.  [Pl.'s Mem.
of Contentions of Fact & Law (Doc. No. 87) at 8.]

11.  No evidence of any written policy, statute or
regulation was produced at trial.  An unwritten
policy may suffice under this first step of the
analysis, but there must be evidence that such a
policy imposed a mandatory duty on prison officials
to reassign inmates or investigate threats to the
safety of inmates.  Alfrey, 276 F.3d at 562; see also
Macharia v. United States, 334 F.3d 61, 66 (D.C. Cir.
2003).

12.  The testimony from the witnesses employed by the BOP
established the lack of an unwritten policy requiring
that all cellmates who physically fought be separated
and reassigned to different cells.  The evidence
adduced at trial as to separation of cellmates who
physically fought revealed no policy requiring the
prison officials to reassign such inmates to separate
cells.  At least two senior corrections officials
testified that after talking to and counseling the
inmates involved in a physical fight, the officers
frequently determined that it was not necessary to
reassign them, as the altercation was an isolated
incident and unlikely to be repeated.  The evidence
from two officers that they were unaware of any
instance when cellmates who fought had not been

1    separated, and from another that it was his usual

2    practice to separate cellmates if future violence was

3    feared was not sufficient; that evidence is not

4    tantamount to a showing that a policy exists

5    mandating the separation and reassignment of inmates.

6  13.  Although the trial testimony revealed the existence

7    of a policy that BOP personnel investigate reports or

8    complaints of violence between cellmates, Plaintiff

9    did not rely upon a theory that violation of such a

10   policy caused his damage here.[3]  Neither in the

11   Pretrial Conference Order [see Pretrial Conference

12   Order (Doc. No. 92) Ex. A at 3, 5], nor in his

13   Memorandum of Contentions of Fact and Law [see Pl.'s

14   Mem. of Contentions of Fact & Law at 9-13], did

15   Plaintiff specify any mandatory, nondiscretionary

16   policy which would exempt this case from the bar of

17   section 2860(a), other than an alleged policy

18   mandating separation and reassignment of inmates who

19

20

21  _____

22        [3]In any event, even if pled and relied upon by the
     Plaintiff, existence of a mandatory policy to investigate
23   a report of inmate-on-inmate violence likely would not
     have supported a finding of liability, as Plaintiff did
24   not produce evidence that the failure to conduct an
     investigation was a "substantial factor" causing his
25   injury.  As described above, the supervisory BOP
     personnel charged with investigating such complaints
26   testified they did not automatically reassign inmates who
     fought; rather, they counseled and attempted to discern
27   whether or not the violence would be repeated.  Williams
     and Hodak both testified, moreover, they thought Padilla
28   and Peña Llanas appeared compatible, based on their
     observations of them.

1    fought.  Accordingly, as the evidence presented at

2    trial did not support a finding that the latter

3    policy existed, Plaintiff's claim is barred.

4

5    Dated:October 31, 2013_____    _____

6                                       VIRGINIA A. PHILLIPS
                                     United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22